FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 FEB 22  PM 3: 50

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARTIN GOULD, JR. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 00-0304 |
| | * | |
| THE M/V GOLDEN DESTINY its tackle, | * | SECTION "N" |
| appurtenances *IN REM*, FREEDOM | * | (Judge Edith Brown Clement) |
| NAVIGATION, INC. and UNIVERSE | * | |
| MARITIME, LTD. | * | MAGISTRATE (2) |
| | * | (Mag. Judge Joseph Wilkinson, Jr.) |

### MOTION FOR SUMMARY JUDGMENT ON LIABILITY ISSUES

NOW INTO COURT, through undersigned counsel, come defendants Freedom

Navigation, Inc. and Universe Maritime, Ltd., who respectfully move this Honorable Court to

grant summary judgment in their favor on liability issues under Rule 56(b), for the reasons set

forth in the accompanying memorandum and supporting attachments, testimony, and affidavits.

496492_1

___Fee_____
___Process___
X /Dktd _____
✓ CtRmDep_____
    Doc.No._____

Respectfully submitted,

_____

Robert B. Fisher, Jr. #5587
Thomas D. Forbes #5682
-OF-
**CHAFFE, McCALL, PHILLIPS,**
 **TOLER & SARPY, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
**Attorneys for Freedom Navigation, Inc. and Universe Maritime, Ltd.**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this _15th_ day of _Filing_, 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by hand delivery, telecopy transmission, or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____

496492_1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARTIN GOULD, JR. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 00-0304 |
| | * | |
| THE M/V GOLDEN DESTINY its tackle, | * | SECTION " N " |
| appurtenances *IN REM*, FREEDOM | * | (Judge Edith Brown Clement) |
| NAVIGATION, INC. and UNIVERSE | * | |
| MARITIME, LTD. | * | MAGISTRATE ( 2 ) |
| | * | (Mag. Judge. Joseph Wilkinson, Jr.) |

**MEMORANDUM OF FACT AND LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

Defendants Freedom Navigation, Inc. and Universe Maritime, Ltd. respectfully submit

this Memorandum in Support of their Motion for Summary Judgment. Summary judgment is

appropriate in this case because the uncontested facts demonstrate that their was no negligence on

the part of the M/T GOLDEN DESTINY or those in charge of her; rather, plaintiff Martin

Gould, Jr. chose to depart the bridge of the docked GOLDEN DESTINY by himself, and

assured the master that he could find his own way to the ship's ladder. Pilot Gould failed to

496492_1

heed the directional signs in the hallways of the ship's accommodation house or cabin, and ended up upon the wrong side of the DESTINY. Instead of proceeding back through the hallway to the correct side, he tried to "improvise" a short cut across the ship's deck which (being a tanker) was crossed by several pipelines. Instead of stepping over one of these pipelines, he stepped on top of it with both feet (pipes are not designed to be walked on) and miss-stepped on the way down, causing the sprained ankle of which he complains.

Freedom and Universe, in support of this Motion for Summary Judgment, offer relevant portions of the deposition testimony of the plaintiff, Martin Gould, Jr.; as well as the master of the M/T GOLDEN DESTINY, Captain Konstadinos Adedakis, which are attached, *see* Exhibits 1 and 2. Defendants also offer the affidavits of their experts, Captain Mitchell Stoller, a master mariner and pilot, and naval architect Rik Van Hemmen, (Exhibits 3 and 4) together with color photographs of the vessel taken both after the accident and more recently by naval architect Van Hemmen, drawings of Mr. Van Hemmen, as well as diagrams made by both Captain Adedakis and Mr. Gould. Defendants also attach a letter report of Gould's "expert" Ed Daniels, who although a fellow member of the Baton Rouge pilots and a colleague of Gould's, essentially agrees with defendants' experts that it is customary in this area that a pilot is not escorted to and from the bridge. Because of this, defendants submit that there is essentially no dispute between the experts in this matter on the subject of commonly accepted maritime practice with respect to an escort.

The facts in this matter will show that Pilot Gould as an experienced pilot, should have been able to safely find his own way down from the bridge of the DESTINY easily, and should not have attempted to cross through the ship's pump room (an unauthorized area) instead of

496492_1

-2-

going back through the hallway. He ignored directional signs, ignored "keep out" signs, and by using bad judgment, caused his own injury. The applicable law will show that Freedom and Universe were free from negligence, and hence this motion for summary judgment should be granted.

## STATEMENT OF FACTS

Martin Gould, Jr. is a state-commissioned Baton Rouge pilot, and has been a commissioned ship pilot between New Orleans and Baton Rouge since 1978 (Gould 8:3-19). As a Baton Rouge pilot, he pilots several hundred ships per year and has also attended a "bridge resource management for pilots" school (Gould, 11:9-24). He has also served on his pilot association's board of directors (*id.*)

On Saturday, February 6, 1999, Gould boarded the DESTINY at 11:30 a.m., while the ship was passing through New Orleans and heading for the GATX Refinery dock in Good Hope, Louisiana (Gould 13:7-17:10), and there was nothing unusual as he guided the ship on the trip upriver. Gould boarded on the ship's port side by way of its accommodation ladder from a launch; he was led aft by one of the ship's crew along the port side of the main deck to the ship's accommodation house, and up to the bridge (Gould 17:12-18:14; 20:15-24:20). At approximately 4:00 o'clock p.m., three tugs came alongside to assist the ship to the dock, and by 1815 the ship was tied up and Gould was ready to depart (Gould 32:3-33:11). The DESTINY, once tied up, had the dock on her starboard (right) side. Gould, however, had previously made arrangements to have a launch pick him up from the ship's ladder on the port or left side, because he did not like the dock access (Gould 29:10-31:3). The master informed Gould that

496492_1

everything was ready for him on the port side, and there was still some daylight, which Gould described as "enough light to see" (Gould 45:1-47:24). Since the ship was now tied at the dock, Gould was ready to depart. According to Gould, "The captain informed me he had no one to bring me down and asked me if I would find my own way", to which Gould said, "I told him okay" (Gould 48:6-11).

Gould then proceeded down the interior stairways and hallways of the ship's accommodation house but in spite of the color-coded directional signs (red indicating port, green indicating starboard), he came out of the hallway "on the wrong side of the ship. I had come out on the starboard side" (Gould 48:33-49:8; Van Hemmen photographs 9 and 10). At this point, the simplest and most direct route for Gould to have taken, and the one with no obstructions, was to simply re-enter the house and walk across to the other end of the hallway and out the exit door on the port side (Van Hemmen affidavit, ¶17; Stoller affidavit, ¶ 27). Instead, Gould, now on the ship's main deck, looked for a more "direct" way, i.e., a "shortcut". When he looked across to port, he saw the ship's pump room and decided to cross the deck by going through it (Gould 49:10-51:7). He did not re-enter the accommodation house, and though he was carrying a hand-held VHF-FM radio that linked him to the ship's bridge radio, he did not ask for assistance or directions. Instead, he crossed over several obstructions which are typical of the middle-deck area of any tanker (Van Hemmen affidavit, ¶32) and entered the pump room, an unauthorized area, in spite of the fact that the pump room is labeled, **"P/ROOM ACCESS PROHIBITED W/OUT C/OFFICER PERMISSION"** (Exhibit 4: Van Hemmen photographs 22 & 23; Van Hemmen affidavit, ¶20).

496492_1

-4-

Gould exited the pump room on the port side by way of a small textured steel platform, about 13 inches off the deck. Close to the end of this platform there is an 8-1/2 inch bunker line, the top of which is located 18-1/2 inches above the deck (Van Hemmen photographs 27 & 28; Van Hemmen drawing attached to Van Hemmen affidavit; Exhibit 4 Van Hemmen affidavit, ¶¶22, 23, 24). Rather than step down from the platform to the left and then step over this pipe one foot at a time, Gould stepped up on top of it with both feet. He then stepped down with his right foot, but as he did so, one of the attending tugs blew its whistle, ". . .. and it distracted me and I looked up and I slipped. I didn't fall on my face or fall down. I caught myself with my left leg and that's when I turned my (right) ankle over" (Gould 58:17-59:12). Lighting was adequate throughout (Gould 75:4-10); *see also* Exhibit 6, (photographs of DESTINY) and Exhibit 4 (photographs of Van Hemmen).

This pipeline is a typical round pipeline, and is not a step. Because of the clear unobstructed walkways on the ship, it was not necessary to either climb over it or step on it. (Exhibit 3, Stoller affidavit, his attached report, p. 4; Van Hemmen affidavit, p. 8, ¶ 32). Nevertheless, Gould chose to step up on top of it because he always steps on top of pipelines as a matter of practice because in the past he had banged his shins or tripped over pipes (Gould 67:24-68:6). The top of the pipeline had no oil or grease on it, but according to Gould, had some sea salt residue (Gould 71:21-72:10). Such deposits of salt are typical for a tanker (or any ship) which has recently completed a sea voyage (Van Hemmen affidavit, ¶26), as Gould was well aware (Gould 74:16-75:3). Gould did not complain that the pipe's surface caused him to slip; rather, he slipped when a tug's whistle startled him, "As I was stepping down with the left foot, that's when the whistle of the tugboat went off and I looked up and I slipped" (Gould 70:7-

496492_1

-5-

10).

After this, the second mate and several other crewmembers who had been standing by the ladder waiting for Gould to arrive, offered assistance to him as did the master.  He was able to climb down the ladder unassisted and get on the launch, accompanied by the second mate. (Gould 79:23-80:23).

When asked again why, once he found himself on the wrong side of the ship, he did not simply go back into the house in order to cross over to the port side, Gould stated, "Because when I looked to the port side I could see through to what I believed was a clear path" (Gould 76:21-77:5).

The accident could have easily been avoided in the first instance if Gould had been patient, and simply waited on the bridge until the third mate, his earlier escort, returned to the bridge, as evidenced by the recent deposition testimony of Captain Adedakis:

EXAMINATION BY MR. FISHER:

Q:     All right.  Going back to Pilot Gould, as I understand your testimony, the third officer was below changing to his coveralls after hauling down the pilot flag and Captain Gould was in the process of telling you goodbye before he went below, his boat was ready; is that correct?

A:     Yes.

Q.     And the second mate and his crew were waiting by the –

A.      Portside.

Q.      -- portside accommodation –

A.      Because already I gave order to wait portside, before to prepare the ladder and wait for the pilot to come portside.

Q.      Did you have an escort or someone to take Captain Gould down if he wanted one?

A.      Of course.

Q.      Who was that?

A.      He wait five minutes, then the third officer. Because already I call him.

Q.      That was the third officer?

A.      Yes.

Q.      Did he wait until the third officer came back to the bridge?

A.      No.

Q.      Do you know why not?

A.      I don't know. Tell me, okay, Captain, don't worry about. I know the way. I go down alone.

Deposition of Adedakis, pp. 137, 138.

496492_1

## ARGUMENT

Gould caused his own accident. As a veteran ship pilot with 22 years experience, he should have known how to exit this tanker, especially in partial daylight with adequate lighting. He was in fact offered an escort by Captain Adedakis, but chose not to wait the five minutes or so it would have taken for that escort (the third mate) to change clothes and return back on the bridge. When asked by the master if he could find his way down, Gould did not protest, but answered "okay". While escorts for pilots in the Mississippi River are common, they are more common for pilots coming on to a vessel and for a vessel actually in navigation doing a pilot change (when the speed of a pilot change is important). This practice is not so universal as to constitute a "custom", since more often than not it is common practice for pilots in this area to disembark from a vessel when a ship is at a dock by exiting the bridge without an escort, particularly when a ship is moored (Stoller affidavit, p. 7). Gould's own "expert", Ed Daniels (a fellow Baton Rouge pilot) agrees that "it is often customary in this area that a pilot must find his own  ingress and egress". *See* Exhibit 5, letter report from Captain Daniels to plaintiff's counsel, dated January 17, 2001.

The DESTINY was safely moored at her dock at GATX, and there was no need for any speed or impatience in the pilot's departure from the ship, but evidently Pilot Gould was impatient. An escort would have been available to him in about five minutes, but he evidently did not want to wait that long. Proceeding by himself after telling the master he would do so, he should have seen the red and green markings in the house passageway to indicate the way to the port (red) side; he either did not pay attention to them or ignored them. Arriving on the

496492_1

-8-

starboard side, he had only to reverse direction and walk back through the hallway, where he knew there were no pipelines or obstructions. Instead, he walked forward on the main deck, and looked for another way across, even though it is common knowledge that there are numerous pipe runs across the middle deck section of tankers. Had he proceeded aft through the house, he would have proceeded safely to the port side. Had he proceeded forward along the open starboard deck to the middle of the ship where the discharge manifolds run, there was a clear walkway to the port side. Either course apparently required more patience than Gould had, because he tried to "improvise" his own shortcut. In so doing he had to step over (or step on to, as apparently was his practice) several pipelines and a coaming, in order to reach the ship's pump room. He then had to disobey (or ignore) the sign which clearly said that entry was authorized only with the chief officer's permission. Since he nevertheless insisted on crossing this way, upon exiting the port side pump room door, he had only to step down to the deck, step over the bunker pipe on which he apparently slipped or miss-stepped, and continue on to the port side. Instead, he stepped on to the pipeline with both feet, and while stepping down, was startled by a tug's whistle (a normal occurrence of which he should have been well aware as a pilot and an ex-tug captain), and in being startled, he mis-stepped and turned his ankle, spraining it.

At any time, Gould could have reversed direction and gone back through the passageway which he knew was safe; he chose not to. He could have heeded the warning not to enter the pump room; he chose to ignore it. He could have simply radioed the bridge on VHF-FM, Channel 16, , and asked for an escort or for directions; he chose not to do so. Instead, he tried to improvise and exit on a path of his own, which was totally unnecessary and while not unsafe, involved a certain amount of care in climbing over a pipeline. There was nothing wrong with

496492_1

the pipeline on which he stepped, except that it was <u>not</u> designed to be a step whether or not this pipeline had sea salt on it, which is a normal condition, and evidently did not cause him any problem on the pipelines on the starboard side of the ship on his way into the pump room.  He did not complain about sea salt to Captain Adedakis, either with respect to the route he took to the bridge during boarding, or after the  accident when he spoke with the master (Exhibit 2, Adedakis, p. 146).

Pilot Gould's accident was entirely of his own making.

## Law And Analysis

Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The substantive law governing the case determines which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 95 L.Ed. 2d 202 (1996).

When the non-moving party bears the burden of proof at trial of a crucial issue, the moving party may merely point out that the evidence and record contains insufficient proof concerning an essential element of a non-moving party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986), *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).  Once the moving party makes the required showing, the burden

shifts to the non-moving party to show that summary judgment is inappropriate. To avoid summary judgment, the non-moving party must, by submitting opposing evidentiary documents or by referencing those already in the record, set out specific facts showing that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. at 324, *Lavespere v. Niagara Machine & Toolworks, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). The non-movant must adduce affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1996); *Fields v. Hallsville Independent School Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 676 (1991). The non-movant must come forward with the specific facts to oppose a motion for summary judgment. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed. 2d 695 (1990). Naked assertions of an actual dispute unsupported by facts do not suffice. *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1999); *Woods v. Federal Home Loan Bank Bd.*, 826 F.2d 1400, 1413-14 (5th Cir. 1997), *cert. denied*, 485 U.S. 959 (1998). The non-movant cannot satisfy its burden with "some metaphysical doubt as to the material fact" or with "conclusory allegations" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). Only evidence-not argumentatively for facts alleged in the complaint – will satisfy the non-movant's burden of proof. *Solo Serv Corp. v. Westowne Associates*, 929 F.2d 160 (5th Cir. 1991). Further, "summary judgment is appropriate in <u>any case</u> where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of a non-movant", *Little v. Liquid Air Corp.*, 37 F.3d at 1075 (*citing Armstrong v. City of Dallas*, 997 So. 2d 62 (La. App. 5th Cir. 1993).

Finally, summary judgments are looked upon with favor and will be upheld unless some

496492_1

-11-

genuine issue of fact is presented. *Id.* at 1075; *U.S. for Use of Edward E. Morgan, Co. v. Maryland Cas. Co.*, 147 F.2d 423, 425 (5th Cir. 1945).

### There Is No Evidence of Any Negligence On the Part of Defendants

Plaintiff, in his Complaint, paragraph VIII, has alleged:

**The conditions then existing that caused plaintiff's injury were due solely to the negligence of the defendants and the defective, hazardous conditions of defendants' vessel, including but not limited to:**

**a.      Allowing the existence of a tripping hazard on the portion of the deck that plaintiff was directed to in exiting the ship; Maintaining a defective deck;**

**b.      Maintaining inadequate lighting in a deck area;**

**c.      Allowing the existence of an unseaworthy condition which contributed to plaintiff's injury; and**

**d.      Any other acts of omission or commission of all defendants that may be shown at the trial of this cause.**

Plaintiff's complaint, on page 2, paragraph VII, as to how this accident occurred, specifically alleges:

**In performance of these aforesaid pilot duties, plaintiff was required to traverse a part of the deck in darkness without adequate lighting whereupon he was caused to fall and suffer an injury because of hazardous conditions then and there existing on the deck of the vessel.**

Now that plaintiff's deposition has been taken, as well as more recently, the master's deposition on February 8, 2001, it is known that the above allegations as set forth in plaintiffs' complaint are simply untrue. No one on the vessel "required" Gould to "traverse a part of the deck in darkness without adequate lighting", since Gould, in his deposition, (page 75) admits

496492_1

there was no problem with the lighting. With respect to the allegation of "defective, hazardous conditions", Gould decided to leave the bridge of the vessel without an escort, although one was offered to him by Captain Adedakis, who told him the third mate was returning to the bridge in a few minutes, then he elected to go below without waiting. Adedakis, p. 137, 138. Gould, in his deposition, did not identify any defective or hazardous areas or equipment, but was only able to mention escort, sea salt on the pipe and the tug whistle as causes of his accident. Gould, pp. 75 and 75..

A question that might be asked is, what was Gould's hurry? The ship was docked, there was no pilot change, it was not moving, Gould's launch was waiting with the second officer and several crewmen attending the accommodation ladder to assist him in disembarking, and he decided to go down by himself.

Gould testified in his deposition, that he did not recall any oil or grease on the pipe, in the vicinity of the pipes or the deck. Gould, pp. 71-72. As discussed above, he also admitted that there was no problem with the lighting. Although he indicates there was "sea salt" on the pipe, some sea salt residue can be found on every ocean-going vessel, especially after they complete a sea voyage. No one would logically expect a pilot with over 20 years of experience such as Gould to step on top of a pipe with both feet and do a "balancing act."

The GOLDEN DESTINY had clear, unobstructed pathways from her boat deck and accommodation areas, on both sides, forward to the areas around the accommodation ladders as shown on the ship's plan and photographs attached. The master testified that there were several safe alternate routes across the ship forward of the pump room, by either walking under the

496492_1

-13-

piping, or going forward to the manifolds where there is a ladder over the pipes. Adedakis, pp. 133-137. It was not necessary for Gould to find his way through an unauthorized area such as the pump room, thereby setting himself up for an accident.

There were no defective or hazardous conditions present on the GOLDEN DESTINY on the evening of February 6, 1999. No equipment either broke or failed, and there were no unseaworthy conditions on the vessel. Everything on her main deck was open and obvious, such as her deck fittings, bitts, rollers, bunker lines, piping and other common vessel parts. She was a typical tanker, and there was nothing unusual about her configuration and piping layout and Gould had been aboard many similar ships. Gould, pp. 75,76. None of the other pilots that had been onboard just before Gould, including the bar pilot and several river pilots, had any difficulty traversing the vessel's decks, either coming up to the bridge or going down from it. Gould's own carelessness caused this accident, obviously triggered by some desire to get off the ship as soon as possible and not wait a few minutes for the third officer to return to the bridge so that he could be escorted to the accommodation ladder.

## The Applicable Standard of Care

It is well settled that a party such as Gould is a "business visitor" or an invitee. As a compulsory state pilot, he is not a Jones Act seaman and therefore is not entitled to a warranty of seaworthiness. *See Bach v. Trident Steamship Co., Inc.*, 920 F.2d 322 (5th Cir. 1991). The only duty that the vessel owes a business visitor (or contractor) such as a pilot like Gould is the "duty of exercising reasonable care." *See Kermarac v. Compagnie Generale TransAtlantique.* 358 U.S. 625, 3 L.Ed.2d 550, 79 S.Ct. 406. Defendants and their vessel have met that duty.

496492_1

### There Is No "Custom" In This Area for a Pilot To Be Escorted From the Bridge of a Vessel When Disembarking, Particularly When The Ship is Docked

There is no United States or international statute or regulation that requires a pilot to be escorted to and from the bridge of a ship when he is embarking and disembarking.  While it is a fairly common maritime practice to escort a pilot to the bridge of a ship after he boards, particularly if she is underway, and because time can be critical during a pilot change, it is much less common for a ship's crewman to escort a pilot from a bridge after the ship has been safely docked in inland waters.  In that situation, just as in the case at bar, it is common for the pilot (as with most dockside visitors) to leave a bridge unescorted and simply retrace his earlier route back to the disembarkation point which in this case was the same, that is, the port side of the DESTINY.  It is noteworthy that when Pilot Gould was ready to depart the bridge after the docking, Captain Adedakis informed him that although he did not then have anyone to escort him down below to the port side, the third mate, who was below changing clothes, would return to the bridge shortly and would then be available to take him down.  When asked if he wanted to wait or if he wished to go down by himself, Pilot Gould responded, "Okay" and went below without waiting for the mate to return.

Defendants' master mariner and expert pilot witness, Captain Mitchell Stoller, in his attached affidavit, points out that an escort from the bridge is not a requirement of the maritime industry and that it is a commonly accepted maritime practice for pilots to disembark from the vessel by departing the bridge on their own and proceeding to the accommodation area without an escort.  This practice, of leaving the bridge unescorted, is particularly common when the pilot has completed his pilotage and the ship is moored, so that all he needs to do is to be able to

496492_1

-15-

simply retrace his earlier route back to the disembarkation area. *See* Affidavit of Captain Stoller, Exhibit 3.

Interestingly, there is no real dispute between defendants' expert pilot/master mariner, Captain Stoller, and plaintiff's "expert", Ed Daniels, who like Gould, is also a member of the Baton Rouge Pilots Association. Daniels essentially agrees with Captain Stoller on the subject of escorts, since he states in his report (*see* Exhibit 5), "It is generally accepted that a NOBRA pilot in this area is often faced with a solo trip from the wheelhouse to the main deck where disembarkation occurs. It is often customary in this area that a pilot must find his own ingress and egress."

Finally, defendants show that plaintiff has not demonstrated the existence of either a universal custom in the maritime industry or even a local one, of an absolute requirement that a pilot be escorted from the ship's railing to the bridge and conversely, from the bridge to the ship's railing when he disembarks. Courts do not usually look with favor upon giving effect to so-called "local customs", even if one could be deemed to exist herein. *See generally, Hal Antillen N.V. v. MT. YMITOS M.S.*, 137 F.3d 447 (5th Cir. 1998) (where the Fifth Circuit, affirming the district court, rejected an alleged custom of vessels meeting starboard to starboard in the area of the Southwest Pass in the Mississippi River).

## CONCLUSION

For the foregoing reasons, together with the attached affidavits, exhibits and the applicable law, defendants Freedom Navigation and Universe Maritime respectfully submit that since there is no genuine issue as to any material fact, defendants are entitled to summary

496492_1

judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure, as a matter of law.  Summary judgment is especially appropriate in this case, where the plaintiff has admitted that he agreed to leave the bridge of the GOLDEN DESTINY without an escort, for none was available at the moment, since the third mate was in the process changing uniforms before returning to the bridge to escort Gould.

Summary Judgment would be especially appropriate in this matter because there is no commonly accepted maritime practice that a pilot, in this area, will always be escorted from the bridge to the disembarkation area, as noted by both plaintiff's and defendants consultants.

There were no defective or hazardous conditions with respect to either the deck or the piping of the GOLDEN DESTINY on February 6, 1999 when Gould sprained his ankle.  An experienced pilot should have known better than to do a two footed "balancing act" on top of a round pipe rather than stepping over it and keeping his feet on a flat deck.  Plaintiff caused his own accident by displaying impatience and a lack of "common sense" since there were many safe alternatives to the route  he chose and the manner in which he chose to cross over the pipe. He caused his own accident and defendants should be dismissed.

Respectfully submitted,

Robert B. Fisher, Jr. #5587
Thomas D. Forbes #5682
-OF-
**CHAFFE, McCALL, PHILLIPS,**
 **TOLER & SARPY, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300

496492_1

-17-

Telephone: (504) 585-7000
**Attorneys for Freedom Navigation, Inc. and Universe
Maritime, Ltd.**

### CERTIFICATE OF SERVICE

I do hereby certify that I have on this _15th_ day of _February_ 2001, served a

copy of the foregoing pleading on counsel for all parties to this proceeding, by hand delivery,

telecopy transmission, or by mailing the same by United States mail, properly addressed and first

class postage prepaid.

496492_1

-18-

## EXHIBITS OF FREEDOM NAVIGATION AND UNIVERSE MARITIME

1. Deposition of plaintiff Martin Gould, Jr. (selected pages)

2. Deposition of plaintiff Captain Konstadinos Adedakis (selected pages)

3. Affidavit of Captain Mitchell Stoller with his report

4. Affidavit of Naval Architect Rik Van Hemmen with his report, photographs, photo captions and drawings

5. Letter of Edgar Daniels of January 17, 2001

6. Color photographs of M/T GOLDEN DESTINY (Adedakis deposition, Exhibit 10)

7. Diagram by plaintiff on ship's plan (Gould deposition, Exhibit 3)

8. Diagram by Captain Konstadinos Adedakis (Adedekis deposition, Exhibit 8A)

497129_1

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED