FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 MAR 13 AM 8:32

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARTIN GOULD, JR. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 00-0304 |
| | * | |
| THE M/V GOLDEN DESTINY its tackle, appurtenances *IN REM*, FREEDOM NAVIGATION, INC. and UNIVERSE MARITIME, LTD. | * * * * | SECTION "N" (Judge Edith Brown Clement) MAGISTRATE (2) (Mag. Judge Joseph Wilkinson, Jr.) |

### DEFENDANTS' REPLY TO PLAINTIFF'S "MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT"

MAY IT PLEASE THE COURT:

Defendants Freedom Navigation, Inc. and Universe Maritime, Ltd., respectfully submit this reply memorandum which shall address certain issues raised by plaintiff in his recently filed Opposition to Defendant's Motion for Summary Judgment.

Plaintiff, in his opposition, suggests that there is a factual dispute that makes summary judgment inappropriate and that defendants reached their duty to plaintiff Martin Gould, Jr. By convolution of the essential undisputed facts, plaintiff seeks to confuse the issues in order to draw attention from the undeniable fact that he caused his own accident and literally, "went out of his

499724_1

-1-



way" to do so.

Defendants have been unable to find a single case remotely identical to the facts in the case at bar in which a U.S. District Court has held a ship owner negligent when an experienced pilot injures himself by stepping up on top of a pipe while in the process of disembarking.

Defendants submit that the following key facts are not in dispute:

1. Plaintiff was escorted from the port side of the GOLDEN DESTINY when he boarded by the third mate, who took him to the bridge by a route aft on the port side, up a stairway to the boat deck and into the accommodation house. (Deposition of Captain Adedakis, p.46, Exhibit 8 to Defendants Motion for Summary Judgment, Deposition of Gould, p. 20);

2. At that time DESTINY was underway in the Mississippi River and Gould relieved the river pilot on the bridge. (Deposition of Adedakis, p. 82);

3. When DESTINY completed mooring operations at the GATX No. 4 dock at Good Hope, Captain Adedakis informed Gould there was no one then available to go down with him. (Deposition of Gould, p. 48; Deposition of Adedakis, p. 114);

4. When informed of this and asked by the master if he would find his own way down, Gould told him "okay" (Deposition of Gould, p. 48);

5. Gould did not wait for an escort to be provided but instead went below (Deposition of Adedakis, pp. 137,138);

6. The DESTINY's second mate and his men were waiting for Gould at the accommodation ladder on the port side (Deposition of Adedakis, p. 137, p. 143)

7. There was signage in the interior passageways on all decks of the vessel indicating "port" and "starboard" directions to the outside, with red arrows for port, green arrows for

499724_1

starboard (Deposition of Adedakis, pp. 118, 119, 121, 122);

8. In spite of this signage, which was present on all decks of the vessel inside its accommodation, Gould mistakenly exited on the starboard side (Deposition of Gould, p. 49);;

9. Realizing he was on the wrong side of the ship, he did not reverse his steps and cross over through the accommodation, but instead elected to proceed forward to the ship's pump room, a prohibited area (Deposition of Adedakis, p. 130 and 131; Photograph No. 23 in Exhibit 4, Motion for Summary Judgment);

10. In order to enter the pump room, Gould had to traverse and cross several pipes, including a bunker line similar to the one he eventually stepped on. (*See* color photos 18 and 20, Exhibit 4 to defendants' motion);

11. Gould exited on the port side of the pump room and stepped off a platform outside the door. Instead of crossing over the bunker pipe, one foot at a time, he stepped up on the pipe with both feet and in doing so, was startled by a tug whistle, and slipped off the pipe, turning his ankle (Deposition of Gould, pp. 67-70);

12. Gould stated there was sea salt on the bunker pipe, (Deposition of Gould, p. 72);

The foregoing facts, giving Gould the benefit of the doubt by even deleting the master's testimony that the third mate was returning to the bridge to escort Gould, (which defendants in no way waive), strongly suggest that defendants' Motion for Summary Judgment should be granted. Gould had at least four opportunities to avoid his accident before it happened, but in going out of his way to take a "short cut", he caused his own accident.

### "Red is Port, Green is Starboard"

One of the first things that a mariner learns during nautical training (whether it be a

499724_1

future ship's officer, a future tug captain or a future pilot), is that "red is port" and "green is starboard." These colors universally mean the same thing, and enable a mariner to quickly sort out the aspect of an approaching vessel by looking at her navigation lights. In this case, the red and green arrows inside the ship clearly indicate direction, either to port or to starboard. Gould's ignoring of the signage inside the GOLDEN DESTINY is unacceptable and defendants submit that an experienced pilot like Gould should have simply followed the signs to the correct side of the ship.

Once Gould exited on the starboard side of the vessel (regardless of matter which deck he was on), it was immediately obvious to him that he was on the wrong side. Instead of reversing his steps and going back into the accommodation passageway and crossing over to the port side, he did not do so but instead elected to go forward to find some other way to cross the ship.

As explained by Captain Adedakis in his deposition, on pages 134 and 135; there were several other ways to get across the ship in addition to the athwartship passageways in the accommodation house. Captain Adedakis testified that simply by walking forward on the starboard side, Gould could have crossed under the fore and aft pipe runs which are elevated above the decks so as to enable crewmembers to walk under the pipes. Additionally, there are ladders and catwalks near the ship's manifold to cross over the pipe runs and finally, one could cross over by walking forward to the bow or aft to the stern. Gould chose not to use any of those perfectly safe alternate routes, but instead walked into and through the ship's pump room, a prohibited area. He emerged on the port side, stepped up on the bunker pipe and slipped off, twisting his ankle.

499724_1

## The "Custom" of an Escort

Defendants, in their earlier filed Memorandum in Support of Motion for Summary Judgment have clearly demonstrated that there is certainly no custom, statute or regulation, or indeed, any custom that requires that a pilot be escorted either from the ship's railing to the bridge or conversely, from the bridge to the ship railing. Plaintiff's expert, Ed Daniels, agrees, stating in his report, "it is often customary in this area that a pilot must find his own ingress and egress." *See* letter report of Ed Daniels, Ex. 5 to defendants' motion.

This is particularly true when a ship is in port, safely moored, and there is no pilot change going on.

When ships are in port, moored at a dock, they are boarded literally dozens of times during their port calls by "business visitors", which may include (not an exclusive list), (1) boarding agents; (2) U.S. Customs, Immigration and Department of Agriculture officials; (3) U.S. Coast Guard inspection teams; (4) marine surveyors; (5) ship repairers; (6) ship chandlers (and other vendors); (7) stevedores and longshoremen; (8) dock and terminal personnel; and (9) even lawyers.

How can it be that the aforementioned types and classes of ship's visitors manage to make it safely from the ship's railing to the captain's office (usually one deck below the bridge), and then upon leaving, manage to find their own way down below to the gangway without the benefit of an escort?

There is no "custom" of escorting any business visitor both to and from the bridge or the captain's office when a vessel is in port whether it is a pilot, an agent, a sales representative, or a lawyer. Most of the people mentioned in the above-enumerated classes of business visitors

499724_1

probably do not have marine backgrounds and certainly do not have the benefit of twenty-two years of experience aboard ships, such as the plaintiff.

How can it be that those above mentioned business visitors manage to make it safely down three or more flights of stairs, exit on the side of the ship where the gangway or accommodation ladder is located and safely get off? The easy answer is that most of them can read and follow signage to, get to the correct side, and then leave the ship safely without doing a balancing act on top of a pipe.

Defendants pointed out in their earlier filed memorandum that not only is there no such "custom", there is certainly no rigid practice or custom of a pilot requiring an escort from the bridge to the railing of a vessel that is safely moored to a dock, in good weather. Did Gould need someone to hold him by the hand under these circumstances? The answer should be a resounding "no".

At the time of this accident, Gould's salary as a Baton Rouge pilot was approximately $240,000 to 250,000 per year. Accordingly to an article on February 26 in the New Orleans "CityBusiness" magazine, the present salary of a Baton Rouge pilot is about $321,000. Surely, an experienced pilot that is making this amount of money should have enough sense not to climb up on top of a pipe, which is not a step.

### The Standard of Care

Plaintiff agrees with defendants that the applicable standard of care in this matter is "reasonable care under the circumstances", under the rationale of *Kermerac v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632, 70 S.Ct. 406, 410, 3 L.Ed. 2d 550 (1959). However, unlike the passenger in *Kermerac*, plaintiff Martin Gould, Jr. is a highly trained

499724_1

marine professional, with 22 years of experience and not only that is a member of the highly prestigious National Advisory Safety Council ("NAVSAC"), which is a national body who advises the Commandant of the U.S. Coast Guard and the Secretary of Transportation on matters relating to maritime safety.  Gould admits in his deposition to having piloted numerous ships the size and type of the M/T GOLDEN DESTINY.  It is submitted that under the circumstances, defendants exercised reasonable care and breached no duty.  As the ship's master, Captain Adedakis testified, the third officer was available to take Gould down from the bridge to the main deck if Gould had been willing to wait only five minutes until the mate returned to the bridge after changing into his work uniform.  There was obviously no hurry, but instead, Gould elected to leave the bridge without waiting for an escort.

It is not the matter of an escort that is so troublesome about this case.  The case involves a trained marine professional who as an experienced pilot who could have easily avoided this accident.  Oil tankers are no more dangerous than any other ship, especially when the bunker pipe in question is not peculiar to oil tankers, but rather, it is a pipe associated with refueling the ship, that all vessels, including bulk carriers, container ships, and oil tankers have as standard equipment on both sides of the vessel close to the accommodation house.  The so-called "inherent dangers on the decks of an oil tanker", as mentioned by plaintiff in his opposition, have absolutely nothing to do with the cause of Gould's accident.

### Conclusion

Even taking the "undisputed material facts" in the light most favorable to Gould, as demonstrated above, there is no real dispute in this case as to what caused plaintiff's accident. The accident was not caused by any malfunction or defect in vessel equipment, insufficient

499724_1

lighting, lack of an escort or even sea salt on top of a pipe which is not a step. Simply stated, the accident was caused by Gould himself who did not demonstrate "reasonable care under the circumstances" and went out of his way to have an accident. Plaintiff, in his opposition does not cite any law, whether statutory or case law, that supports Gould's position. Moreover, plaintiff did not present any countervailing affidavits, which would be essential to his opposition, even assuming *arguendo*, that there is a "custom", which there is not.

For the foregoing reasons, together with the reasons earlier stated by defendants in their motion with accompanying affidavits and exhibits, plaintiff's complaint should be dismissed.

Respectfully submitted,

_____
Robert B. Fisher, Jr. #5587
Thomas D. Forbes #5682
-OF-
**CHAFFE, McCALL, PHILLIPS,
  TOLER & SARPY, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
**Attorneys for Freedom Navigation, Inc. and
Universe Maritime, Ltd.**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this ____ day of _____, 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by hand delivery, telecopy transmission, or by mailing the same by United States mail, properly addressed and first class postage prepaid.

_____

499724_1